UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA (MOBILE)

| | |
|---|---|
| UTILITY WATER ACT GROUP, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS, AND AMERICAN PETROLEUM INSTITUTE,<br><br>       Plaintiffs,<br><br>       v.<br><br>NATIONAL MARINE FISHERIES SERVICE, WILBUR ROSS, in his official capacity as Secretary of Commerce, UNITED STATES FISH AND WILDLIFE SERVICE, AND RYAN ZINKE, in his official capacity as Secretary of the Interior,<br><br>       Defendants. | CIVIL ACTION NO.  1:17-cv-00206 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This suit challenges two rules that make sweeping and unlawful changes to the federal regulations governing (1) designation of land or water as "critical habitat"; and (2) the determination that federal actions cause "adverse modification" to such areas.  These rules have burdensome and costly implications for a wide range of commercial activities on private, state, and federal lands and waters.  The Utility Water Act Group ("UWAG"), National Rural Electric Cooperative Association ("NRECA"), National Association of Home Builders ("NAHB"), and American Petroleum Institute ("API") (collectively, "Plaintiffs") challenge these rules on the bases that they are arbitrary and capricious, an abuse of discretion, exceed the statutory authority on which they rely, and are otherwise contrary to law.

## I.     NATURE OF THE ACTION

1.       This action, brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, et seq., and the Endangered Species Act ("ESA" or the "Act"), 16 U.S.C.

§§ 1531, et seq., seeks review of two final rules promulgated by Defendants United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, the "Services") that significantly reshape the regulations governing the designation of—and ESA Section 7 consultation on—critical habitat, and unlawfully expand the Services' authority.

2.     First, the Services issued a rule to revise the criteria for designation of critical habitat.  Dep't of the Interior & Dep't of Commerce, Listing Endangered and Threatened Species and Designating Critical Habitat; Implementing Changes to the Regulations for Designating Critical Habitat; Final Rule, 81 Fed. Reg. 7414 (Feb. 11, 2016) ("Critical Habitat Rule") (Ex. A). Second, the Services promulgated a revised definition of "destruction or adverse modification" of critical habitat.  Dep't of the Interior & Dep't of Commerce, Interagency Cooperation— Endangered Species Act of 1973, as Amended; Definition of Destruction or Adverse Modification of Critical Habitat; Final Rule, 81 Fed. Reg. 7214 (Feb. 11, 2016) ("Adverse Modification Rule") (Ex. B) (collectively, the "Final Rules").

3.     The ESA directs the Services, at the time they list a species as endangered or threatened, to designate "any habitat of such species which is then considered to be critical habitat," where prudent and determinable "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(a)(3)(A), (b)(2).

4.     Congress designed critical habitat to play a more modest role than the listing of a species.  Specifically, the prohibition on "destruction or adverse modification" of critical habitat does not apply directly to private activities, but instead is implemented through application of

ESA Section 7 consultation to "insure" that any activity funded, carried out or authorized by a federal agency—such as the issuance of permits or licenses to Plaintiffs' members—is not likely to "result in the destruction or adverse modification of" designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  Given the multitude of federal agency actions that can be necessary for Plaintiffs' members to conduct their business activities, these regulatory requirements routinely impact private activities.  And the impact of an adverse modification determination for a project can be profound:  it requires the development of a "reasonable and prudent alternative" in order for the action to proceed, absent an exemption from the prohibition (and no exemption has ever been granted).  16 U.S.C. § 1536(b)(3)(A).

5.     The Final Rules include new and revised definitions that go far beyond the limits Congress intended to place on the role of critical habitat under the ESA.  The Critical Habitat Rule, for example, allows the Services to designate areas not actually occupied by a listed species as critical habitat where the Services conclude that, as a result of potential future changes to the habitat and the potential for the species to start using that area in the future (e.g., as a result of possible climate change effects), the area is "essential for the conservation of the species."  81 Fed. Reg. at 7435.  Similarly, the Adverse Modification Rule would allow project-altering (if not project-halting) adverse modification findings based on the risk that an impact to an area designated as critical habitat could delay the development of habitat features that a species may find beneficial in the future.  The Services' new approach allows the Services to, e.g., find adverse modification based on impacts that "appreciably diminish" the value of the habitat to the species, including impacts that "delay development" of features deemed essential for the conservation of the species.

6.     The Final Rules impose substantial additional burdens, including costs and delays on Plaintiffs, their members, and, ultimately, U.S. consumers, and place significant restrictions on land use and activities.  Plaintiffs' members have been immediately and substantially impacted by the Services' adoption of the Final Rules.  Plaintiffs' members frequently undertake critical and time-sensitive infrastructure and development projects, such as residential and commercial development, utility line maintenance and construction, oil and gas exploration, development, and transportation, and other energy projects, which require federal authorizations and thus trigger consultation under ESA Section 7.  In addition, Plaintiffs and their members have been immediately impacted by the Services' proposals to designate critical habitat for listed species pursuant to the Critical Habitat Rule.  Plaintiffs have expended significant resources participating in the public comment process to oppose overly broad proposed designations that flow from the unlawful promulgation of the Critical Habitat Rule.

7.     The Final Rules ignore important statutory limits.  The breadth of the Rules exceeds the Services' statutory authority and lacks scientific justification, and the terms of the Final Rules are arbitrarily vague.  The Service failed to account for the significant economic burdens that would result from adoption of the Final Rules.

8.     As a remedy for Defendants' violations of law in adopting the Final Rules, Plaintiffs seek an order declaring that the Final Rules violate the ESA and the APA; invalidating and setting aside the Final Rules; enjoining the Services from applying or enforcing the Rules; and any other relief this Court deems proper.

## II.   THE PARTIES

9.     UWAG is a voluntary, ad hoc, non-profit, unincorporated group of 163 individual energy companies and three national trade associations of energy companies: the Edison Electric Institute, NRECA, and the American Public Power Association.  The individual energy

companies operate power plants and other facilities that generate, transmit, and distribute electricity to residential, commercial, industrial, and institutional customers.

10.     UWAG's purpose is to participate on behalf of its members in federal agency rulemakings under the Clean Water Act and related statutes, such as the ESA, and in litigation arising from those rulemakings.  UWAG has expended significant resources to ensure that its members, and the government agencies that regulate their activities, understand and faithfully implement the goals and requirements of the ESA.

11.     Electric utilities operate and maintain a wide range of existing facilities across the nation.  Many of the individual energy companies that comprise UWAG have public service obligations to ensure a reliable and safe supply of electricity to their customers.  The supply of electricity throughout the country involves the construction, operation, and maintenance of electric generation facilities, transmission and distribution lines, and other system control facilities.  The construction of new generation facilities is needed to meet new federal and state energy and environmental requirements, and the construction of new transmission lines is needed to relieve congestion on the electrical grid, to wheel power between utilities, and to connect new sources of electrical energy (such as wind and solar facilities) to the electrical grid—all of which serve to increase the reliability and diversity, and manage the cost, of electricity.

12.     NRECA is the national service organization dedicated to representing the national interests of cooperative electric utilities and the consumers they serve.  NRECA represents over 900 private consumer-owned rural electric cooperatives and public power districts, who collectively provide electric service to an estimated 42 million people in 47 states or nearly 13 percent of the nation's electric customers.  They serve more than 19 million businesses, homes, schools, churches, hospitals, farms, irrigation systems and other establishments.  NRECA serves

its members as an advocate for legislative and regulatory policies that are scientifically sound, cost-effective, and balance consumer interests and environmental protection.

13.     Electric cooperatives are an integral part of the U.S. electric utility industry, and play a critical role in our nation's economy and in local communities.  NRECA members deliver safe, reliable, and affordable electric service to vast rural areas of the United States.  Electric cooperatives own and maintain 2.6 million miles, or 42 percent, of the nation's electric distribution lines, covering three quarters of the nation's landmass.

14.     UWAG, NRECA, API, and several other national trade associations impacted by the Services' critical habitat proposals submitted comments on the proposals on October 9, 2014. API, et al., Comments on Three Endangered Species Act Critical Habitat Proposals of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service Published on May 12, 2014 (Oct. 9, 2014), Docket Nos. FWS-HQ-ES-2012-0096-0144, FWS-R9-ES-2011-0072-0126, and FWS-R9-ES-2011-0104-0123 ("Energy Coalition Comments") (Ex. C).

15.     NAHB is a national trade association incorporated in the State of Nevada.  NAHB consists of more than 140,000 builder and associate members organized into more than 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. Its members include individuals and firms that construct single-family homes, apartments, condominiums, and commercial and industrial projects, as well as land developers and remodelers, and employ between 6 million and 8 million workers.  More than 80 percent of NAHB's members are classified as "small businesses" and meet the federal definition of a "small entity," as defined by the U.S. Small Business Administration.

16.     Through its advocacy function on behalf of the Nation's home builders, NAHB represents its members in legal, regulatory, and legislative matters affecting the use and

development of their land.  It is germane to NAHB's organizational purpose to ensure that its members can use their property to the fullest extent allowed by law so they may build and supply housing for all people throughout the United States, regardless of income level, race, or nationality.

17.     NAHB submitted comments on the proposed rules on October 8, 2014 and joined comments submitted by the National Endangered Species Act Reform Coalition ("NESARC"), of which it is a member.  NAHB, Comments on Proposed Rule—Definition of Destruction or Adverse Modification of Critical Habitat (Oct. 8, 2014), Docket No. FWS-R9-ES-2011-0072-0064) ("NAHB Adverse Modification Comments") (Ex. D); NAHB, Comments on Listing Endangered and Threatened Species and Designating Critical Habitat; Implementing Changes to the Regulations for Designating Critical Habitat (Oct. 8, 2014), Docket No. FWS-HQ-ES-2012-0096-0081 ("NAHB Critical Habitat Comments") (Ex. E); NESARC, Comments on the FWS/NMFS Proposed Rule on Definition of Destruction or Adverse Modification of Critical Habitat (Oct. 9, 2014), Docket No. FWS-R9-ES-2011-0072-0116 (Ex. F); NESARC, Comments on the FWS/NMFS Proposed Rule Implementing Changes to the Regulations for Designating Critical Habitat (Oct. 9, 2014), Docket No. FWS-HQ-ES-2012-0096 (Ex. G).  In addition, NAHB state affiliates filed comments on the proposals.  *See, e.g.,* California Building Industry Association & the Building Industry Legal Defense Foundation, Comments on Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act; Definition of Destruction or Adverse Modification of Critical Habitat; Listing Endangered and Threatened Species and Designating Critical Habitat (Oct. 9, 2014), Docket No. FWS-R9-ES-2011-0072-0158.

18.     NAHB routinely participates in ESA related litigation on behalf of its members, including *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007),

*Defenders of Wildlife v. Flowers*, 414 F.3d 1066 (9th Cir. 2005), and *National Association of Home Builders v. Norton,* 340 F.3d 835 (9th Cir. 2003).

19.     Independent of this litigation, NAHB has expended significant resources to ensure that its members, and the government agencies that regulate their residential construction activities, understand and faithfully implement the goals and requirements of the ESA.  In this regard, NAHB has devoted staff and monetary resources to sponsor and deliver educational programs to assist members with ESA compliance and has drafted comments to ensure that proposed regulations are consistent with what Congress intended in enacting the ESA.  For example, on February 6, 2013, NAHB submitted comments on the Services' proposed revisions to their regulations on impact analyses conducted for designations of critical habitat.  NAHB, Comments on Proposed Revisions to the Regulations for Impact Analyses of Critical Habitat (Feb. 6, 2013), Docket No. FWS-R9-ES-2011-0073-0104.

20.     API is a nationwide, non-profit trade association that represents over 600 companies involved in all aspects of the petroleum and natural gas industry, from the largest integrated companies to the smallest independent oil and gas producers.  API's members include producers, refiners, suppliers, pipeline operators, and marine transporters, as well as service and supply companies that support all segments of the industry.  API and its members are dedicated to meeting environmental requirements, while economically developing and supplying energy resources for consumers.

21.     Actions, pursuant to the ESA, to list endangered or threatened species or to designate critical habitat have significant ramifications for Plaintiffs, their members, and the communities they serve.  Such actions add costly and time consuming permitting requirements under the ESA and other federal statutes, and can delay time-sensitive maintenance and

construction activities required to provide affordable and reliable service to consumers. Plaintiffs UWAG, NRECA, and API routinely participate in ESA rulemakings through submission of comments on proposed listing determinations and proposals to designate critical habitat for listed species.  For example, NRECA and API submitted comments on FWS's status review of the Lesser Prairie Chicken.  NRECA, Comments on the U.S. Fish and Wildlife Service 90-Day Finding and Initiation of Status Review for the Lesser Prairie-Chicken (Jan. 30, 2017), Docket No. FWS-R2-ES-2016-0133-0027; API, et al., Comments on the U.S. FWS's 90-day Finding on a Petition to List the Lesser Prairie Chicken as an Endangered Species under the ESA (Jan. 30, 2017), FWS-R2-ES-2016-0133-0029.   And Plaintiffs API and UWAG filed comments on FWS's proposal to designate 546,335 acres of critical habitat for the western distinct population segment of the yellow-billed cuckoo. API, et al., Comments on U.S. Fish and Wildlife Service Proposal to Designate Critical Habitat for the Western Distinct Population Segment of the Yellow-Billed Cuckoo**,** 79 Fed. Reg. 48,548 (Aug. 15, 2014), 79 Fed. Reg. 67,154 (Nov. 12, 2014) (Jan. 12, 2015), Docket No. FWS-R8-ES-2013-0011-1149.  *See also* API & Independent Petroleum Association of America ("IPAA"), Comments on Listing the Northern Long-Eared Bat With a Rule Under Section 4(d) of the ESA (Mar. 17, 2015), Docket No. FWS-R5-ES-2011-0024-3547; API & IPAA, Comments on the U.S. FWS's 90-Day Finding on a Petition to List the Rusty-Patched Bumble Bee as an Endangered Species under the ESA (Nov. 17, 2015), FWS-R3-ES-2015-0112-0010; API, et al., Comments on the U.S. FWS's Proposed Decision to List the Rusty-Patched Bumble Bee as Endangered under the ESA (Nov. 21, 2016), FWS-R3-ES-2015-0112-0171; API, et al., Comments on the NMFS's 12-Month Finding on a Petition to List the Gulf of Mexico Bryde's Whale as Endangered under the ESA (Feb. 6, 2017), NOAA-NMFS-2014-0157-0927.

22.     The activities of Plaintiffs and their members are subject to regulation under the actions challenged in this Complaint.  Plaintiffs' members are harmed by the Critical Habitat Rule, which will result in broader designations of critical habitat.  Plaintiffs' members own or have rights to use land or water that is within the range of listed species or species under consideration for listing under the ESA, and therefore Plaintiffs' members' land or water may be designated as critical habitat.  Such designation can impose significant costs and burdens that will be borne by property owners (such as Plaintiffs' members), electric utilities, and other state and local governments.  Some of the economic effects of critical habitat designations include increases in the costs of development, losses relating to the inability to proceed with development, project redesign to avoid modifications of areas deemed to be critical habitat, and reduction in the size of projects as it becomes more difficult to obtain the necessary federal permits.  As a result, critical habitat designation often results in an immediate reduction in the market value and other economic value of the areas.

23.     For example, members of Plaintiffs UWAG and API are harmed by NMFS's reliance on the Critical Habitat Rule to designate critical habitat for listed species.  On June 3, 2016, NMFS proposed to designate over 4,200 river miles of critical habitat for the Atlantic Sturgeon based on the new, broad designation criteria of the Critical Habitat Rule.  Dep't of Commerce, Endangered and Threatened Species; Critical Habitat for the Endangered Carolina and South Atlantic Distinct Population Segments of Atlantic Sturgeon; Proposed Rule, 81 Fed. Reg. 36,078 (June 3, 2016), and Dep't of Commerce, Endangered and Threatened Species; Designation of Critical Habitat for the Gulf of Maine, New York Bight, and Chesapeake Bay Distinct Population Segments of Atlantic Sturgeon; Proposed Rule, 81 Fed. Reg. 35,701 (June 3, 2016).  Pursuant to a settlement reached with several environmental organizations, NMFS has

consented to issue a final rule designating critical habitat for the sturgeon within one year of publication of the proposed rule – or by June 3, 2017.

24.     The proposed designation covers large, undifferentiated swaths of rivers, extending bank to bank for all of the 4,200 river miles, with no attempt to carve out less valuable areas or even unused areas.  NMFS proposed to designate areas where the Service "inferred" spawning locations based on particular characteristics, and proposed to designate three unoccupied areas above dams on particular river systems, even though those areas are not accessible to the species, based on evidence that these areas either historically served as spawning areas or "could [] serve as spawning habitat . . . should they become accessible in the future."  81 Fed. Reg. at 36,080, 36,088.  The proposal is contrary to the obvious and fundamental statutory principle that only habitat that is truly "critical" to the species is to be designated.

25.     Plaintiffs UWAG and API submitted extensive comments on NMFS's proposed designation of critical habitat for the Atlantic Sturgeon.  UWAG & API, Comments on Proposals to Designate Critical Habitat for Atlantic Sturgeon Distinct Population Segments (Sept. 1, 2016), Docket Nos. NOAA-NMFS-2015-0107-0095 and NOAA-NMFS-2015-0157-0182 (Ex. H). Individual UWAG members also filed comments on NMFS's proposal.  UWAG's and API's comments opposed the breadth of area proposed for inclusion as critical habitat, based on the application of the Critical Habitat Rule.  The comments noted that the proposal would designate areas that do not have and likely never will have characteristics essential for the conservation of the species, and failed to draw connections between features deemed essential to the species and all of those specific areas proposed for designation.

26.     The Atlantic Sturgeon proposal is an example of the injuries Plaintiffs face as a result of the Services' adoption of the Critical Habitat Rule, and the costs they will bear for designations based on the Rule.  Plaintiffs and their members also incur significant costs to participate in ESA rulemakings that result from promulgation of these unlawful Rules to defend against harmful and overbroad critical habitat designations.  Plaintiffs and their members will continue to be impacted by overly broad proposals that apply the Critical Habitat Rule to unlawfully designate broad swaths of land and water as critical habitat.

27.     Plaintiffs' members have in the past and will in the future undertake important development and infrastructure projects that require federal permits or licenses and thus trigger consultation under ESA Section 7.  As a result of the Adverse Modification Rule, the Services will be more likely to determine that a federal agency action will destroy or adversely modify critical habitat.

28.     The Section 7 consultation process immediately imposes burdens on Plaintiffs' members due to the expense and time required for consultation, the potential for imposition of additional requirements, and litigation risk.  If federally listed species or designated critical habitat may be affected by the proposed project, consultation will occur either informally, with written concurrence from NMFS or FWS that the proposed activity is "not likely to adversely affect" listed species or designated critical habitat, or through formal consultation with a biological opinion provided to the action agency (the agency issuing the funding, permit or license).  In practice, formal consultation may take a year or more.  If formal consultation is initiated, the Service will issue a biological opinion and often include an associated incidental take statement.  When an action is determined to jeopardize listed species or adversely modify critical habitat, the Service must suggest reasonable and prudent alternatives to avoid the

likelihood of jeopardy and/or adverse modification.  Reasonable and prudent alternatives include measures to avoid, minimize, or mitigate impacts to the species and/or critical habitat and can be extensive and influence the cost, timing, scope, location, and feasibility of a project.

29.    Plaintiffs' members have been directly harmed by application of the Adverse Modification Rule.  For example, FWS and a state permitting agency consulted on reissuance of a National Pollutant Discharge Elimination System ("NPDES") Permit for a wastewater treatment plant and related operations.  On the basis of the new rule, FWS took the position that entrainment and/or impingement of mussel host fish species is likely to adversely affect critical habitat because the presence of abundant host fishes is considered a physical and biological feature essential to the conservation of listed species.  But FWS made no determination showing that the loss of host fish would have a meaningful impact on the mussel, and provided no objective quantification of implications of loss of host fishes for the recovery of species – demonstrating that the standard is vague and limitless, and is likely to produce arbitrary results. To prevent an adverse modification finding under this new looser standard, FWS sought open-ended commitments and further study to address the agency's vague concerns under the ambiguous adverse modification standard.  If the studies indicate that federally listed species and/or designated critical habitat are affected by the project, FWS could require additional site-specific and species-specific measures to avoid and minimize effects to federally listed species and designated critical habitat on the basis of the vague adverse modification standard.

30.    The injuries Plaintiffs' members face as a result of the promulgation of the unlawful Rules can be redressed by this Court's order declaring that the Services exceeded their authority under the ESA and violated the APA in promulgating the Final Rules.

31.     NMFS is an agency of the National Oceanic and Atmospheric Administration of the United States Department of Commerce.  NMFS has been delegated responsibility for administering the provisions of the ESA. The authority delegated to NMFS to administer and implement the ESA is subject to, and must be in compliance with, the applicable requirements of the ESA and the APA.

32.     Wilbur Ross, in his official capacity as Secretary of Commerce, directs all business of the Department of Commerce, including NMFS. In his official capacity as Secretary of Commerce, Secretary Ross is responsible for the Final Rules and for the associated violations of the ESA and the APA as alleged in this Complaint.

33.     The FWS is an agency of the United States Department of the Interior. FWS has been delegated responsibility for administering the provisions of the ESA. The authority delegated to FWS to administer and implement the ESA is subject to, and must be in compliance with, the applicable requirements of the ESA and the APA.

34.     Ryan Zinke, in his official capacity as Secretary of the Interior, directs all business of the Department of the Interior, including FWS.  In his official capacity as Secretary of the Interior, Secretary Zinke is responsible for the Final Rules and for the associated violations of the ESA and the APA as alleged in this Complaint.

## III.    JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Judicial review of this final agency action is authorized by the APA.  5 U.S.C. §§ 702, 704, and 706.  28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57 authorize the declaratory relief requested.  Injunctive relief is authorized by 28 U.S.C. § 2202.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703.  The Final Rules adversely impact Plaintiffs' members' projects, facilities, and operations located in this judicial district.

## IV.   BACKGROUND

### A.   Statutory Background

37.     When the ESA was enacted in 1973, Section 7 of the Act required that federal agencies consult with the Services to insure that actions did not jeopardize listed species or "result in the destruction or modification of habitat of such species which is determined by the Secretary . . . to be critical." Pub. L. No. 93-205, 87 Stat. 884, 892 (1973). The Act did not require the Services to designate critical habitat when listing a species as endangered or threatened, nor did it define the term "critical habitat." *Id.*

38.     In 1978, Congress revised the Act.  Leading up to the 1978 ESA Amendments, Congress was concerned that, under then-current regulations, the Services were treating areas covering the entire range of a species as "critical to the continued existence of a species" and, in particular, noted concern about "the implications of this policy when extremely large land areas are involved in a critical habitat designation."  S. Rep. No. 95-874, at 948 (1978).

39.     In response to these concerns, the 1978 Amendments defined "critical habitat" narrowly and in detail.  The 1978 Amendments included several new provisions relating to critical habitat, including a new requirement that, "to the maximum extent prudent," the Services "specify any habitat . . . considered to be critical" at the time it proposed to list a species.  Pub. L. No. 95-632, 92 Stat. 3751, 3764 (1978) (codified at 16 U.S.C. § 1533(a)(3)(A)).

40.     The term "critical habitat" for a threatened or endangered species means:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the

conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A)(i)-(ii).

41.     Through this definition, Congress imposed five very specific limits on those areas subject to designation as "occupied" critical habitat:  (1) specific areas within the area occupied by the species; (2) at the time the species is listed; (3) on which are found physical or biological features; (4) essential to conservation of the species; that (5) may require special management considerations or protection.

42.     Congress defined "conservation" in terms demonstrating that it did not have in mind designation of wide areas to be left fallow or unproductive, but instead *specific areas* where proactive efforts would be taken by government and other resource bodies to recover the species:

> [T]o use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

43.     Congress also specifically distinguished between occupied and unoccupied habitat by including more stringent requirements for designation of unoccupied habitat.  Designation of *unoccupied* areas requires the Secretary to separately find that such designation is "itself *essential*" to the conservation of the species.

44.     Further demonstrating Congress's sensitivity to the impacts of designating critical habitat, even where designation would otherwise meet the statutory criteria, Congress provided that the Services may exclude areas where the benefits of exclusion outweigh the benefits of designation, unless the Services determine that failure to designate the area "will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2).

45.     Thus, Congress established limited, specific objectives for the designation of critical habitat, placed specific restrictions and limits on the Services governing that designation, and required the Services to consider all impacts – including economic impacts – of the designation of critical habitat.  The designation must be "prudent and determinable," 16 U.S.C. § 1533(a)(3)(A), "tak[e] into consideration the economic impact" of the designation, *id.* § 1533(b)(2), and consider impacts on national security and any other relevant impacts.  *Id.*

**B.     Regulatory Background**

46.     In 1984, the Services promulgated comprehensive amendments to their ESA regulations.  49 Fed. Reg. 38,900 (Oct 1, 1984).  The 1984 critical habitat regulations provide that critical habitat should not be designated if doing so is not prudent or if critical habitat is not determinable.  50 C.F.R. § 424.12(a) (1984).  Designation of critical habitat is not *prudent* if designation will increase the threat of taking or other human activity to the species and/or if designation would not be beneficial for the species.  *Id.* § 424.12(a)(1).  Designation of critical habitat is not *determinable* when information to analyze the impact of the designation is lacking and/or the biological needs of the species are not well known enough to enable identification of an area as critical habitat.  *Id.* § 424.12(a)(2).

47.     Consistent with the plain language of the ESA, the preamble to the 1984 regulations recognizes that all critical habitat designations must be based on finding that the "designated area contains features that are essential in order to conserve the species concerned.

This finding of need will be a part of all designations of critical habitat, whether or not they extend beyond a species' currently occupied range."  49 Fed. Reg. at 38,903.

48.     The statutory element of "physical or biological features . . . essential to the conservation of the species," 16 U.S.C. § 1532(5), was emphasized in the 1984 regulations by focusing designations on the presence of features (or elements) essential to the species:  "When considering the designation of critical habitat, the Secretary *shall focus on the principal biological or physical constituent elements* within the defined area that are essential to the conservation of the species," including sites for roosting, nesting, spawning, and feeding, geological formations, vegetation, soil, and water quality.  49 Fed. Reg. at 38,909  (codified at 50 C.F.R. § 424.12(b)(1-5) (1984)) (emphasis added).

49.     This emphasis on the statutory requirement that an area contain the requisite physical or biological features was reflected in the regulatory definition of "destruction or adverse modification," which directly references the physical or biological features that were the basis for the critical habitat designation: "alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical."  50 C.F.R. § 402.02 (1986).

50.     The regulatory history further demonstrates that the Services intended to designate unoccupied habitat "*only when a designation limited to its present range would be inadequate* to ensure the conservation of the species."  49 Fed. Reg. at 38,909 (codified at 50 C.F.R. § 424.12(e) (1984)) (emphasis added).

V.     **FACTUAL ALLEGATIONS**

A.     **The Services' Proposed Rules Attempted to Dramatically Expand Their
       Statutory Authority to Designate Critical Habitat and Make Adverse
       Modification Findings.**

51.     On May 12, 2014, the Services published two proposed rules. The first proposal

revised the definition for "destruction or adverse modification" by introducing the amorphous

concept of "conservation value," and allowing for adverse modification determinations based on

new or future physical and biological features not present at the time of designation. *See* 79 Fed.

Reg. 27,060 (May 12, 2014). The second proposal substantially expanded the criteria for

designation of critical habitat, affording the Services far greater latitude to designate critical

habitat in a manner that exceeds and is contrary to the ESA. 79 Fed. Reg. 27,066 (May 12,

2014).

52.     In the proposed Adverse Modification Rule, the Services asserted that the

proposed rule "would not have a significant economic effect on a substantial number of small

entities." 79 Fed. Reg. at 27,065. In both proposals, the Services took the position that a

regulatory flexibility analysis under the Regulatory Flexibility Act ("RFA"), as amended by the

Small Business Regulatory Enforcement Fairness Act ("SBREFA"), is not required because the

proposed rules only directly affect federal agencies, and they are not considered to be small

entities. *Id;* 79 Fed. Reg. at 27,075.

53.     Plaintiffs filed detailed comments on the proposed rules. Exs. C, D, E, F.

Plaintiffs UWAG, NRECA, and API explained that the proposals would significantly reshape

and further complicate the critical habitat process, and unjustifiably expand the Services'

authority to designate critical habitat. Plaintiff NAHB commented that the proposed

modifications would undermine Congress's clear intent that critical habitat be limited in scope.

Plaintiffs pointed out the fundamental problems that undermined the proposals, noting, for

example, that the Services' expansive approach ignored important statutory limits, lacked

scientific justification, and the proposed terms were arbitrarily vague.  The comments further

explained that the Services failed to acknowledge or account for the significant economic

burdens that would result.  In sum, Plaintiffs urged the Services to substantially change and

narrow the proposals as a matter of law and policy before issuing any final rules.

**B.    The Final Critical Habitat Rule Broadly Defines Critical Habitat and
       Significantly Expands the Services' Authority to Include Unoccupied Areas.**

54.    The Services issued a final rule to revise the criteria for designation of critical

habitat on February 11, 2016.  81 Fed. Reg. 7414 (Feb. 11, 2016).

55.    The 1984 regulations did not define the term "geographical area occupied by the

species," and the term was generally applied to mean the area *actually* occupied by the species.

The Critical Habitat Rule, however, broadly defines this term to include all areas within a series

of connected dots where the species has been known to occur, even if just occasionally:

> An area that may generally be delineated around species' occurrences, as
> determined by the Secretary . . . .   Such areas may include those areas used
> throughout all or part of the species' life cycle, even if not used on a regular basis
> (*e.g.*, migratory corridors, seasonal habitats, and habitats used periodically, but
> not solely by vagrant individuals).

81 Fed. Reg. at 7439 (codified at 50 C.F.R. § 424.02).

56.    Under this definition, "occupied" critical habitat includes areas around the

species' occurrences, including those areas that are used only periodically or temporarily by the

species.  *Id*.  The Services' definition allows for designation of habitat as *occupied* "even if not

used on a regular basis."  *Id*.  This would include specific areas of land or water not (and which

may never be) actually occupied by the species.  Thus, the entire areas of the country deemed to

be "migratory corridors" for a bird (or a fish) could be deemed "occupied" by the species, even if

the species rarely, if ever, touched foot (or fin) within large portions of those corridors.  By this

logic, Alabama could be deemed to be "occupied" by a retired resident of Illinois who passes through Alabama twice per year *en* route to and from a winter home in Florida.  Similarly, Ohio, Virginia, or North Carolina could be deemed to be "occupied" by a federally endangered Kirkland's Warbler that passes through those States during its fall migration from Michigan to the Bahamas.

57.     Designating areas where species are not actually found as "occupied" critical habitat goes beyond what the statute allows.  In the ESA, Congress specified that areas *outside* the geographical area occupied by the species may be designated only upon a separate, specific, additional determination by the Secretary that doing so is essential to the conservation of the species.  16 U.S.C. § 1532(5).  The Critical Habitat Rule subverts this choice by Congress by (1) treating areas as occupied that are not actually occupied; and (2) prompting the Services to concurrently designate occupied and unoccupied critical habitat without first determining whether designation of only occupied critical habitat would be sufficient.  In this regard, the Critical Habitat Rule departs from the Services' prior approach to unoccupied habitat, which required the Service to first determine it could not conserve the species with the inclusion of only the "geographic area presently occupied" by the species.  The Critical Habitat Rule removes this prior first step and, instead, allows the Services to consider occupied and unoccupied areas concurrently.  By allowing the Services to issue critical habitat designations that do not meet the statutory definition, the Critical Habitat Rule is contrary to the ESA.

58.     The Services' prior regulations also focused critical habitat designations on the presence of primary constituent elements essential to the species:  "[w]hen considering the designation of critical habitat, the Secretary *shall focus on the principal biological or physical constituent elements* within the defined area that are essential to the conservation of the species."

50 C.F.R. § 424.12(b) (1984) (emphasis added).  The Critical Habitat Rule, however, abandons the requirement that the Secretary focus upon and list primary constituent elements when designating critical habitat.

59.     Instead, the Critical Habitat Rule relies on a broader, more subjective requirement to identify "physical and biological features essential to the conservation of the species," which can include "ephemeral or dynamic" habitat features and features that allow for the "development of habitat characteristics … usable by the species."  81 Fed. Reg. at 7439 (codified at 50 C.F.R. §§ 424.02, 424.12(b)(1)(ii)), 7422.  Thus, under the Critical Habitat Rule, physical and biological features essential to a species would not need to actually be present at the time of designation so long as the habitat has the potential to support the emergence or development of such features *in the future*.  *Id.* at 7439.

60.     Designation of areas based on *potential* future occurrence of features that could be used by the species is contrary to the Act's present tense definition of critical habitat, which allows for designation of occupied areas on which essential physical or biological features "are found."  *See* 16 U.S.C. § 1532(5)(A)(i).  The ESA does not allow designations where such features *may* be found in the future.

61.     In addition, the ESA requires that critical habitat determinations be based on the "best scientific data available."  16 U.S.C. § 1533(b)(2).  Allowing for designation of areas based on physical or biological features that have been absent for years and may or may not occur in the future is speculative, not scientific, arbitrary, and contrary to the Act's definition of critical habitat and "best available" science standard.

62.     The Critical Habitat Rule allows unoccupied areas to be designated as critical habitat based on potential, future effects to those areas, including projected climate change

impacts.  81 Fed. Reg. at 7434-35.  The preamble specifically notes that, "[a]s the effects of global climate change continue to influence distribution and migration patterns of species, the ability to designate areas that a species has not historically occupied is expected to become increasingly important."  *Id.* at 7435.

> Where the best available scientific data suggest that specific unoccupied areas are, or it is reasonable to determine from the record that they will eventually become, necessary to support the species' recovery, it may be appropriate to find that such areas are essential for the conservation of the species and thus meet the definition of "critical habitat."

*Id.*  Thus, the Services newly claim the authority to designate areas as critical habitat to account for species' and habitat's projected, speculative future response to climate change.

63.     As Plaintiffs noted in their comments, the science and modeling do not provide reliable predictions of species' response to climate change, nor do they provide reliable predictions of climate change impacts in specific geographic ranges that would be sufficient to support designation of critical habitat pursuant to the EPA.  Energy Coalition Comments at 39. These specific limitations have been recognized by the Intergovernmental Panel on Climate Change ("IPCC").  IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2013), http://www.ipcc.ch/report/ar5/index.shtml.  In particular, the current state of climate science does not support impact projections below a continental or regional scale, and specifically not to the localized and highly complex habitat of any particular species.  *Id.* at 810-817, 826.

64.     The Critical Habitat Rule fails to acknowledge the limitations of climate change models and the significant uncertainty and variability inherent in those projections to estimate future responses by species and their habitats.  Instead, and in response to comments urging the

Services to revisit this approach, the Services elliptically assert that "the statute as written allows for sufficient flexibility to address the effects of climate change in a critical habitat designation." 81 Fed. Reg. at 7426.  Critical habitat designations based on projected climate change impacts are speculative and contrary to the Act's requirement to make designations based on the "best scientific data available." 16 U.S.C. § 1533(b)(2).

### C.   The Final Adverse Modification Rule Unlawfully Redefines and Broadens the Definition of "Destruction or Adverse Modification"

65.   The Services promulgated a revised definition of "destruction or adverse modification" of critical habitat on February 11, 2016.  81 Fed. Reg. 7214 (Feb. 11, 2016).

66.   The Adverse Modification Rule defines "destruction or adverse modification" as

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

81 Fed. Reg. at 7226 (codified at 50 C.F.R. § 402.02).

67.   The new definition adopts a standard that is virtually unlimited.  The Services state that an adverse modification finding may be made even if the area currently does not have the requisite "physical or biological features" and is in "degraded condition," based on its potential to "improv[e] over time relative to its pre-action condition."  81 Fed. Reg. at 7216-17. But this approach would allow the Services to make findings of adverse modification based on impacts to unoccupied areas that are currently degraded by human activities and have no physical or biological features that support the needs of the species based solely on the potential of the area to have features in the future that would support the future recovery of the species.

68.   A finding of adverse modification based on such unlimited concepts as new or future physical and biological features is arbitrary.  The statutes requires that, for occupied areas,

24

such physical and biological features must be "found" and in existence at the time of designation, not be based on the potential for such features to be found at some point in the future.  16 U.S.C. § 1532(5)(A)(i).

69.     Consideration of future biological features is speculative, and thus contrary to the "best scientific data available" standard and the Supreme Court's caution in *Bennett v. Spear* that the ESA must not be "implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

70.     The Adverse Modification Rule also broadens the Services' interpretation of the term "appreciably diminish."  Previously, "appreciably diminish the value" meant "to *considerably reduce* the capability of designated or proposed critical habitat to satisfy requirements essential to both the survival and recovery of a listed species."  FWS and NMFS, Consultation Handbook; Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act at 4-36 (Mar. 1998), https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (emphasis added). In the preamble to the Adverse Modification Rule, however, the Services "clarif[y]" that the term "considerably" means "worthy of consideration."  81 Fed. Reg. at 7218.  "Appreciably diminish" is found where the Services "can recognize or grasp the quality, significance, magnitude, or worth of the reduction in the value of critical habitat."  *Id*.  This capacious change allows the Services to find adverse modification based on any measurable effect.

     **D.     The Final Rules Violate the APA and the RFA.**

71.     In adopting the Final Rules, the Services violated the notice and comment rulemaking procedures established by the APA.

72.     The Services did not meaningfully or adequately address Plaintiffs' concerns that the Final Rules would exceed their statutory authority.  Instead, the Services' response to

comments generically asserted that the agencies are "exercising their discretion to resolve ambiguities . . . in the statutory language," and the Final Rules are a "permissible interpretation of the statute."  81 Fed. Reg. at 7416; 81 Fed. Reg. at 7224.

73.    The Services also failed to address numerous concerns raised by Plaintiffs regarding the scope of critical habitat described in the proposed rules.  Plaintiffs UWAG, NRECA, and API expressed concerns that the proposed rules reserve broad discretion for the Services to determine the extent of critical habitat designations.  For example, areas could be designated as critical habitat despite having no features essential to a species.  Energy Coalition Comments at 32.  Plaintiff NAHB expressed similar concerns that the proposed revisions "would override the intent of Congress that critical habitat be limited in scope and focus on areas essential to the species' continued existence, i.e., its survival."  NAHB Critical Habitat Comments at 4.

74.    The Services failed to provide a basis for abandoning the decades-old requirement that they determine that occupied areas are not sufficient for conservation before designating unoccupied areas, a concern raised by Plaintiffs UWAG, NRECA, and API.  Energy Coalition Comments at 36-37.  The Services have long acknowledged that they must determine that occupied areas are insufficient for conservation before designating unoccupied areas.  Even if the statute permits the Services to adopt a contrary approach and designate both simultaneously, the Services failed to offer a legitimate explanation for changing their approach.

75.    Instead, in an attempt to justify their change in position, the Services assert that the prior regulations "may result in a designation that is geographically larger, but less effective" and "that the inclusion of all occupied habitat in a designation does not support the best conservation strategy."  81 Fed. Reg. at 7415.  But the Services do not point to any evidence that

the previous process compelled larger designations, let alone required them to simply designate all occupied areas.  Indeed, that approach would have violated the requirement of ESA Section 3(5)(A)(i) that the Services designate only certain "specific areas within the geographical area occupied by the species" and the limitation of Section 3(5)(C) on including "the entire geographical area which can be occupied."  16 U.S.C. § 1532(5)(A)(i), 1532(3)(5)(C).

76.     In adopting the Final Rules, the Services failed to respond to numerous comments from Plaintiffs regarding the meaning and application of critical terms.  For example, UWAG, NRECA, and API stated the proposed new definition of "geographical area occupied by the species" was overbroad because, in addition to areas actually occupied by the species, it includes areas that are used only "periodically or temporarily" by the species, without explaining what is meant for a species to be temporarily or periodically present.  Energy Coalition Comments at 32.  The Services declined to define the phrase or provide guidance, asserting that any response might not cover every conceivable situation, species, or data set.  81 Fed. Reg. at 7421 ("We will use the best scientific data available to determine occupied areas including those that are used only periodically or temporarily by a listed species . . . .  This will be determined on a species-by-species basis.").  Similar responses were given to requests for guidance on what constitutes a "reasonable expectation" of recurrence, *id.* at 7419, "essential features," *id.* at 7422, and "appreciabl[e] diminish[ment]." 81 Fed. Reg. at 7218.

77.     The Services failed to meaningfully respond to Plaintiffs' comments regarding climate change, and, in particular, the reliability of climate change modeling.  *See* Energy Coalition Comments at 40, n.20; *see also* NAHB Critical Habitat Comments at 48 (explaining that the effects of climate change are speculative).  In response, the Services merely state that the statute provides sufficient flexibility to address climate change in a critical habitat designation

and "data have been available showing the shift in habitat use by a species."  81 Fed. Reg. at 7426.  But this response fails to meaningfully respond to Plaintiffs' concerns or to acknowledge the limitations of climate change data.

78.     The Services also failed to consider the economic costs associated with Final Rules, or to respond to comments discussing how the revised designation process and the use of vague and ill-defined terms is likely to result in increased costs.  Energy Coalition Comments at 44.  Rather than respond to those concerns, the Services simply assumed that costs will not increase because "[t]he amended regulations do not substantially change the manner in which critical habitat is designated."  81 Fed. Reg. at 7416.

79.     As with the proposed rules, in the Final Rules, the Services certified under the RFA that a regulatory flexibility analysis was not required because the Final Rules only apply to federal agencies and do not directly impact others.  *Id.* at 7428; 81 Fed. Reg. at 7224.  This assertion was wrong.  The designation of areas owned by a private party as critical habitat has immediate impacts and burdens for the landowner and others who may use those areas, including actual or perceived reductions in the value of such areas.  *See, e.g.,* Energy Coalition Comments at 8-11.  And the application of the definition of adverse modification through the Section 7 consultation process will also result in an increase in economic burdens for regulated parties.  *Id.*

## VI.     CLAIMS FOR RELIEF

### COUNT ONE
### The Final Rules Are Arbitrary, Capricious, and an Abuse of Discretion, Exceed the Services' Statutory Authority, and Are Otherwise Contrary to Law

80.     Plaintiffs incorporate by reference, as if fully set forth here, each and every allegation set forth in paragraphs 1 through 79 above.

81.     The ESA sets important statutory limits on the designation of critical habitat and adverse modification determinations.  *See* 16 U.S.C. §§ 1533(a)(3)(A), 1536(a)(2).

82.     The Final Rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A) because, among other things, they exceed the Services' ESA authority, are unsupported by the law, and are inconsistent with the plain language of the ESA.

83.     In addition, Defendants violated the RFA, 5 U.S.C. §§ 601-612, by failing to follow its requirements for avoiding undue impacts on small business.  Among other things, Defendants failed to undertake a regulatory flexibility analysis as required by the RFA.  Thus, the Final Rules are contrary to law.

## COUNT TWO
### The Final Rules Violate the APA's Notice and Comment Rulemaking Procedures

84.     Plaintiffs incorporate by reference, as if fully set forth here, each and every allegation set forth in paragraphs 1 through 83 above.

85.     The APA provides that an agency give notice of a proposed rule setting forth "either the terms or substance of the proposed rule or a description of the subject and issues involved," 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  *Id.* § 553(c).

86.     The APA requires administrative agencies to engage in "reasoned decisionmaking."  The agencies "must examine the relevant data and articulate a satisfactory explanation for its action including a rationale connection between the facts found and the choice made."  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

87.     The Final Rules were promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D) because, among other things, the Final Rules fail to provide meaningful responses to Plaintiffs' comments, explain the changes made in the Final

Rules, or provide guidance for consistent application of the Final Rules in a manner that complies with the ESA's statutory requirements. The Final Rules are thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request this Court to

1. Declare that the Final Rules are unlawful and violate the APA and the ESA;

2. Vacate and set aside the Final Rules in their entirety;

3. Enjoin the Services from enforcing or otherwise acting pursuant to the Final Rules; and

4. Grant such other and further relief as the Court deems just and proper.

Date:  May 11, 2017

Respectfully submitted,

/s/ D. Bart Turner
J. Alan Truitt (ASB-5068-T82J)
D. Bart Turner (ASB-0051-N75T)
KAZMAREK MOWREY CLOUD LASETER LLP
3008 7th Avenue South
Birmingham, Alabama  35233
(205) 767-8870
bturner@kmcllaw.com
atruitt@kmcllaw.com

Andrew J. Turner*
Karma B. Brown*
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave. NW
Washington, DC  20037
(202) 955-1500
aturner@hunton.com
kbbrown@hunton.com

*Counsel for Plaintiffs*
*Utility Water Act Group, National Rural*
*Electric Cooperative Association, National*
*Association of Home Builders, and American*
*Petroleum Institute*

*  *Pro hac vice* applications pending

Of Counsel:

Thomas J. Ward
Jeffrey B. Augello
NATIONAL ASSOCIATION OF HOME BUILDERS
1201 15th Street, N.W.
Washington, DC  20005
(202) 266-8200

*Counsel for Plaintiff National Association of Home Builders*

Stacy R. Linden
Matthew A. Haynie
AMERICAN PETROLEUM INSTITUTE
1220 L St. N.W.
Washington, DC  20005
(202) 682-8000

*Counsel for Plaintiff American Petroleum Institute*